UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

OCT 2 3 2006

MICHAEL N. MILBY, CLERK OF COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Case No. |
| 2121 KIRBY DRIVE, UNIT 33, | ) | |
| HOUSTON, TX, | ) | **H-06-3335** |
| | ) | |
| ASSETS OF KLL & LPL | ) | |
| INVESTMENTS, LTD., | ) | |
| | ) | |
| $22,680 located in BANK OF AMERICA | ) | |
| ACCOUNT No. 0026-6253-0707 | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT IN SUPPORT OF VERIFIED COMPLAINT FOR FORFEITURE

I, Chad Nunez, being duly sworn, depose and say:

1.    I am a Special Agent with the Federal Bureau of Investigation and have been so employed since March 1997.  In January 2002, I was assigned to the Enron Task Force in Houston, Texas, and have participated since then in an investigation into the circumstances surrounding the financial collapse of the Enron Corp. ("Enron").  Prior to that, I was assigned to the El Paso Field Division of the Federal Bureau of Investigation, where I conducted numerous investigations into various types of fraud, including fraud against the government, mail fraud, wire fraud, and money laundering, with a particular emphasis on tracing assets derived from

1

criminal activity for potential seizure and forfeiture purposes.

2.       The Superseding Indictment in <u>United States v. Jeffrey K. Skilling and Richard A.</u>

<u>Causey</u>, Criminal Case No. H-04-25, which is contained herein as Attachment A to the

Complaint, set forth probable cause to believe that officials at Enron, including, KENNETH L.

LAY ("Lay") committed, <u>inter alia</u>, conspiracy to commit wire and securities fraud, in violation

of Title 18, United States Code, Section 371, and wire fraud and securities fraud, in violation of

Title 18, United State Code, Sections 1343, and Title 15, United States Code, Sections 78j(b),

78ff and 17 C.F.R. 240.10b-5.  Following his trial and conviction in the criminal matter, Lay

died, necessitating the filing of a civil action to effect forfeiture of traceable criminal proceeds to

compensate the victims of the fraud at Enron.

3.       This affidavit details the criminal activity at Enron, including certain money

laundering activity of Lay not addressed in the criminal proceedings, setting forth probable cause

to believe that Lay was involved in the criminal activity.  As set forth below, there is probable

cause to believe that the defendant Bank of America funds in account No. 0026-6253-0707, and

investment partnership property are derived from proceeds traceable to fraud in the sale of

securities in violation of 15 U.S.C. §§ 78j(b) and 78ff, wire fraud in violation of 18 U.S.C. §

1343, and conspiracy to commit securities fraud under 18 U.S.C. § 371, and are therefore subject

to forfeiture under 18 U.S.C. § 981(a)(1)(C).  In addition, there is probable cause to believe that

the defendant investment partnership property was involved in money laundering in violation of

18 U.S.C. § 1957, and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).  So

too, there is probable cause to believe that the defendant real property was involved in money

laundering in violation of 18 U.S.C. § 1957, and is therefore subject to civil forfeiture under 18

2

U.S.C. § 981(a)(1)(A).

## I.    THE CONSPIRACY AT ENRON

### A.    Background

4.    Enron Corp. ("Enron") was an Oregon corporation with its headquarters in Houston, Texas. Among other businesses, Enron was engaged in the purchase and sale of natural gas and power, construction and ownership of pipelines, power facilities and energy-related businesses, provision of telecommunications services, and trading in contracts to buy and sell various commodities. Before it filed for bankruptcy on December 2, 2001, Enron was the seventh largest corporation in the United States.

5.    Enron was a publicly traded company whose shares were listed on the New York Stock Exchange and were bought, held, and sold by individuals and entities throughout the United States and the world. Enron and its directors, officers, and employees were required to comply with regulations of the United States Securities and Exchange Commission ("SEC"). Those regulations protect members of the investing public by, among other things, requiring that a company's financial information is fully and accurately recorded and fairly presented to the public. The regulations require, among other things, that a company submit filings to the SEC in Washington, D.C. that include fair and accurate financial statements and management discussion and analysis of a company's business.

6.    The price of Enron's stock was influenced by factors such as Enron's reported revenue, earnings, debt, cash flow, and credit rating, as well as its growth potential and consistent ability to meet revenue and earnings targets and forecasts. Enron executives provided guidance to the investing public regarding anticipated revenue, earnings for upcoming reporting periods,

and other information regarding Enron's business activity. Such guidance was communicated in presentations and conference calls to securities analysts and in other public statements by Enron executives. Relying in part on the company's guidance, securities analysts disseminated to the public their own estimates of the company's expected performance. These earnings estimates, or analysts' expectations, were closely followed by investors. Typically, if a company announced earnings that failed to meet or exceed analysts' expectations, the price of the company's stock declined.

7.      It was also critical to Enron's ongoing business operations that it maintain an investment grade rating for its debt, which was rated by national credit rating agencies. An investment grade rating was essential to Enron's ability to enter into trading contracts with its counterparties and to maintain sufficient lines of credit with major banks. In order to maintain an investment grade rating, Enron executives were required to demonstrate that its financial condition was stable and that the risk that Enron would not repay its debts and other financial obligations was low. The credit rating agencies relied on, among other things, Enron's public filings, including its financial statements filed with the SEC, in rating Enron's debt. In addition, members of Enron's senior management spoke regularly with, and provided financial and other information to, representatives of credit rating agencies. Two primary factors influencing Enron's credit rating and the willingness of banks to extend loans to Enron were Enron's total amount of debt and other obligations and its cash flow.

8.      As detailed below and proven at trial in United States v. Causey, et al., 04-25 (S.D. Tex.), there was a wide-ranging scheme to deceive the investing public, including Enron's shareholders, the SEC, and others, about the true performance of Enron's businesses by: (a)

manipulating Enron's publicly reported financial results; and (b) making public statements and representations about Enron's financial performance and results that were false and misleading in that they did not fairly and accurately reflect Enron's actual financial condition and performance, and they omitted to disclose facts necessary to make those statements and representations fair and accurate.

9.    Lay was named Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "board") of Enron upon its formation in 1986. Lay held both of these positions until February 2001, when he stepped down as CEO and continued as Chairman, and Jeffrey Skilling ("Skilling") became the CEO. On August 14, 2001, Skilling abruptly resigned from Enron and Lay resumed his position as Enron's CEO while remaining Chairman.

10.    Lay oversaw the operations of Enron's numerous business units. As CEO, Lay was responsible for supervising the activities of each of Enron's business units and the heads of those business units, as well as the activities of the senior Enron managers who conducted the company's financial and accounting activities. Lay and Skilling held weekly management meetings with the leaders of Enron's business units to review, among other things, the company's budget and operating performance.

11.    Lay and Skilling also routinely provided guidance and information concerning the company's performance to securities analysts, as well as to Enron's employees and the public. Indeed, Lay and Skilling served as Enron's principal spokespersons with the investing public. Lay also reviewed and approved proposed press releases concerning Enron, and signed Enron's annual reports filed on Form 10-K with the SEC.

12.    As Chairman, Lay was responsible for presiding over meetings of the Board and

5

assisting in developing the agenda for Board meetings. Among other things, the Board periodically reviewed Enron's operations, financial results, proposed transactions and executive compensation. Lay and Skilling also attended meetings of the Board's committees, including the Finance Committee and the Audit and Compliance Committee. According to its charter, the Finance Committee served as a "monitor for the Company's financial activities" and reviewed and approved the company's significant financings, debt levels, and performance of portfolio assets, among other things.

13.    Lay had numerous co-conspirators, including, but not limited to: Skilling, who, along with Lay as CEO was responsible for supervising the activities of each of Enron's business units and the heads of those business units, as well as the activities of the senior Enron managers who conducted the company's financial and accounting activities; Richard Causey, Enron's Chief Accounting Officer ("CAO"), and reported to Lay and Skilling; Andrew Fastow, Enron's Chief Financial Officer ("CFO"), who supervised such matters as Enron's structured finance, cash flow, and debt management activities; Ben Glisan, Enron's Treasurer, who also assisted in supervising Enron's structured finance, cash flow and debt management activities; David W. Delainey, the CEO of two Enron business units -- Enron North America ("ENA") and Enron Energy Services ("EES") -- who supervised large portions of Enron's wholesale energy business and, later, its retail energy business; Wesley Colwell, the CAO of ENA, who managed the accounting for Enron's wholesale energy business; Michael Kopper, a Managing Director in Enron's Global Finance group, who conducted structured finance activities for Enron and assisted in running important Enron off-balance sheet vehicles; as well as others.

**B.    Lay's Proceeds from the Criminal Conspiracy**

6

14.     The co-conspirators enriched themselves as a result of the scheme through salary, bonuses, grants of stock and stock options, other profits, and prestige within their professions and communities.

15.     In addition, during the relevant time frame from the first quarter of 2001 until Enron filed for bankruptcy protection in December 2001, Lay enriched himself by selling Enron stock worth approximately $11.589 million; selling an additional $66.025 million in Enron stock to pay down his Enron line of credit (a line of credit on which he never paid down an additional $7.5 million in borrowings); and receiving a $10 million bonus for re-assuming the CEO position at Enron following the departure of Jeffrey Skilling.  His family investment partnership, of which he was the managing partner, also sold stock during this time frame that yielded $3.957 million in gross proceeds.

### C.     Overview of Scheme to Defraud

16.     In or about and between the first quarter 2001 and December 2001, both dates being approximate and inclusive, within the Southern District of Texas and elsewhere, Lay and others, did knowingly and intentionally conspire (1) to willfully and unlawfully use and employ manipulative and deceptive contrivances and directly and indirectly (i) to employ devices, schemes and artifices to defraud; (ii) to make untrue statements of material fact and omit to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) to engage in acts, practices, and courses of conduct which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchase and sale of Enron securities and by use of the instruments of communication in interstate commerce and the mails, all in violation of Title 15, United States

7

Code, Sections 78j(b) and 78ff and Rule 10b-5 of the SEC, Title 17, Code of Federal

Regulations, Section 240.10b-5. The conspiratorial acts violated 18 U.S.C. § 371.

17.    Skilling spearheaded the scheme until his sudden departure in August 2001, at

which point Lay took over leadership of the conspiracy. Due to the efforts of the co-conspirators,

the financial appearance of Enron presented to the investing public concealed the true state of

Enron. Enron's publicly reported financial results and filings and its public descriptions of itself,

including in public statements made by and with the knowledge of Lay and others, did not

truthfully present Enron's financial position, results from operations, and cash flow of the

company and omitted facts necessary to make the disclosures and statements that were made

truthful and not misleading. The misleading portrayal of Enron's financial condition supported

Enron's stock price and its credit rating.

18.    The conspiracy's objectives included:

- reporting recurring earnings that falsely appeared to grow smoothly by approximately 15 to 20 percent annually and thus create the illusion that Enron met or exceeded the published expectations of securities analysts forecasting Enron's reported earnings-per-share and other results;

- touting falsely the success of Enron's business units;

- concealing large losses, "write-downs," and other negative information concerning its business units;

- masking the true magnitude of debt and other obligations required to keep the company's varied and often unsuccessful business ventures afloat;

- deceiving credit rating agencies in order to maintain an investment-grade credit rating; and

- artificially inflating the share price of Enron's stock, including attempting to stem the decline of Enron's share price in 2001.

19.    For a significant time, the scheme to support artificially the share price of Enron's stock succeeded. In early 1998, Enron's stock traded at approximately $30 per share. By January 2001, even after a 1999 stock split, Enron's stock had risen to over $80 per share. Until the scheme unraveled in late 2001, Enron maintained an investment grade credit rating.

20.    On August 14, 2001, Skilling resigned from Enron. Enron's stock price, which had been declining since January 2001, fell sharply. Lay resumed his position as CEO of the company, intensified his oversight of Enron's day-to-day operations, and took control of the conspiracy. For a time, the conspirators were able to forestall even greater declines in the price of Enron stock by various levers, until mid-October when the scheme started to unravel and Enron ultimately filed for bankruptcy in December 2001.

21.    During the last two weeks of August 2001 and the first week of September 2001, Lay was briefed by numerous Enron employees on Enron's mounting and undisclosed financial and operational problems, including several billion dollars of losses embedded in Enron's assets and business units. As a result of these and other issues confronting Enron, Lay and others privately considered a range of potential solutions, including mergers, restructurings, and even divestiture of Enron's pipelines, assets that Lay considered to be the crown jewels of the company.

22.    Throughout the remainder of September 2001, Lay and others engaged in a series of high-level meetings to discuss the growing financial crisis at Enron and the likely impact on Enron's credit rating. Among other things, as Lay knew, the total amount of losses embedded in Enron's assets and business units was, at a minimum, $7 billion. Lay also learned that Enron's auditors had changed their position concerning the accounting treatment of four off-balance sheet

9

vehicles called the Raptors, which required Enron to determine in short order whether an acceptable alternative methodology existed or whether, instead, Enron would have to restate its earnings and admit the error.

23.     In the weeks leading up to Enron's third quarter earnings release on October 16, 2001, the conspirators determined that Enron could not publicly report a loss in excess of $1 billion without triggering negative action by Enron's credit rating agencies.  Lay thus artificially capped Enron's losses at that amount, by among other things, making false statements to Enron's auditors in order to avoid disclosure of additional write-downs.  On October 16, 2001, when Enron announced losses of approximately $1 billion, Lay sought to minimize the import of the reported losses and continued to make false and misleading statements to the market about Enron's financial health.

24.     From this juncture, the scheme rapidly unraveled.  On October 22, 2001, Enron announced that it was the subject of an SEC investigation.  By October 23, 2001, Lay had authorized Enron to enter into merger discussions with its far smaller rival, Dynegy Inc. ("Dynegy").  On October 25, 2001, Lay authorized Enron to use the remaining $3 billion from its corporate lines of credit.  On October 29 and November 1, 2001, the two leading credit rating agencies downgraded Enron's credit rating.  On November 8, 2001, Enron announced its intention to restate its publicly reported financial statements for 1997 through 2000 and the first and second quarters of 2001 to reduce previously reported net income by an aggregate of $586 million.  The next day, Enron and Dynegy announced a merger agreement.  On November 28, 2001, Enron's credit rating was further downgraded to "junk" status and Dynegy announced its withdrawal from the merger agreement.  And on December 2, 2001, Enron filed for bankruptcy,

making its stock, which less than a year earlier had been trading at over $80 per share, virtually worthless.

**D.    Devices Employed in Furtherance of Scheme**

25.    At various times, the co-conspirators presented Enron's financial results, which had been engineered to appear far more successful than they actually were, in a false and misleading manner to the investing public through, among other things, conferences with securities analysts and rating agencies, press releases, media statements, and SEC filings.

26.    The co-conspirators used and caused to be used secret oral side-deals, back-dated documents, disguised debt, material omissions, and outright false statements to further the scheme.  The conspirators employed the following devices in furtherance of the fraudulent scheme:

- structuring financial transactions in a misleading manner in order to achieve earnings and cash flow objectives, avoid booking large losses in asset values, and conceal debt, including through the fraudulent use of purported third-party entities that in fact were not independent from Enron;

- manufacturing earnings and artificially improving Enron's balance sheet through fraudulent overvaluation of assets;

- fraudulently circumventing accounting standards applicable to the sale of financial assets in order to conceal the amount of Enron's debt and to create the false appearance of greater earnings and cash flow;

- concealing large losses and failures in Enron's two highly-touted new businesses, Enron Broadband Services ("EBS") and EES;

- manipulating earnings through fraudulent use of reserve accounts to mask volatility in Enron's wholesale energy trading earnings and use those reserves later in order to appear to achieve budget targets;

- fraudulently circumventing accounting standards applicable to the disclosure and recognition of impairments to goodwill; and

11

- making false and misleading statements, and omissions of facts necessary to make statements not misleading, about Enron's financial condition.

**E.     Concealing EES Failures**

27.     In presentations to the investing public, the conspirators emphasized the performance and potential of EES as a major reason for past and projected increases in the value of Enron's stock. In order to enable EES to appear successful, the conspirators concealed EES' massive losses by fraudulently manipulating Enron's "business segment reporting," portraying EES as an unblemished success, and misrepresenting the performance of EES under various performance assessment measures.

28.     EES was a struggling business unit with severe financial and structural problems. Enron executives nonetheless made materially misleading statements and failed to disclose material information about the true financial state of EES.

29.     Enron executives furthermore manipulated EES's financial position through a reorganization designed to conceal the existence and magnitude of EES's business failure. Large portions of EES's business – which otherwise would have to report hundreds of millions of dollars in losses – were moved into another Enron business unit, Enron Wholesale. Enron Wholesale was capable of hiding these losses because it housed most of the company's wholesale energy trading profits. In spite of his knowledge of this action, at various times Lay claimed publicly that EES was continuing to perform successfully and failed to disclose that hundreds of millions in EES losses had been shifted to Enron Wholesale.

**F.     Fraudulently Circumventing Goodwill Impairment Accounting Standards**

30.     In the third quarter of 2001, the conspirators fraudulently circumvented the

12

accounting standards with respect to "goodwill." The goodwill value of a company is generally the difference between the cost of an acquired entity and the recorded value of the entity's net assets. In or about June 2001, a new accounting rule, known as FAS 142, eliminated the ability to amortize goodwill impairments over a 40-year span, effective January 2002. Lay undertook to determine the impact of the new goodwill rule on Enron for the purpose of disclosing in Enron's third quarter 2001 results that the rule would not adversely effect Enron's financial results.

31.     Enron owned direct and indirect interests in Wessex Water Services ("Wessex"), a United Kingdom-based water company that Enron had purchased in 1998 as part of a strategic initiative to establish a large international water business called Azurix. By October 2000, Enron executives, including Lay, recognized that Enron's water growth strategy had failed. In early 2001, Enron announced that the water business was not one of its "core businesses" and began the process of selling water-related assets. In the third quarter of 2001, as Lay knew, Enron's internal accountants had determined that the amount of goodwill attributable to Wessex was approximately $700 million. As Lay also knew, Enron's internal accountants also determined that Enron would have to disclose the impact on Enron of a Wessex goodwill impairment unless Enron was able to assert that Wessex would once again pursue a water growth strategy backed by Enron. Enron's internal accountants estimated that pursuing such a strategy would require Enron to expend between $1.5 and $28 billion.

32.     Lay knew that Enron neither intended to pursue nor had the capital necessary to support a water growth strategy. Lay also knew that the credit rating agencies would view an announced impairment as a reason to reevaluate Enron's precarious credit rating. Nevertheless, in October 2001, in order to avoid disclosing the impact on Enron of any goodwill impairment

13

associated with Wessex, Lay falsely claimed to Enron's auditors that Enron was committed to developing a water growth strategy. Lay then failed to disclose to the market the impact on Enron of an impairment of Wessex goodwill, when Lay purported to disclose the impact on Enron of all goodwill impairment that had been reviewed by Enron and its auditors.

### G.     False and Misleading Representations To Investing Public, SEC And Rating Agencies

33.     At various times during the conspiracy, the conspirators made false and misleading statements as well as material omissions about Enron's financial results, the performance of its businesses, and the manner in which its stock should be valued. These statements and material omissions were disseminated to the investing public in conferences, telephone calls, press releases, interviews, statements to the media and rating agencies, and SEC filings.

34.     August 20, 2001 Media Interview. On August 20, 2001, Lay conducted an interview with BusinessWeek. Lay stated, "There are no accounting issues, no trading issues, no reserve issues, no previously unknown problem issues. The company is probably in the strongest and best shape it has ever been in. There are no surprises." He added, "Investors don't like uncertainty. When there's uncertainty they always think there's another shoe to fall. There is no other shoe to fall." In fact, as Lay knew, the balance sheet reflected approximately $7 billion in embedded losses in business units and overvalued investments. Lay also knew that Enron faced the prospect of goodwill writedowns totaling in the billions of dollars. In addition, just days earlier, Lay had been placed on notice of accounting issues that threatened an "implosion" of Enron.

14

35.    <u>September 26, 2001 Employee On-Line Forum</u>.  On September 26, 2001, Lay

held an on-line forum with Enron employees.  Lay stated that "[t]he third quarter is looking

great.  We will hit our numbers.  We are continuing to have strong growth in our businesses, and

at this time I think we're positioned for a very strong fourth quarter."  He added that "we have

record operating and financial results" and that "the balance sheet is strong."  In fact, as Lay

knew, Enron was preparing to announce a significant overall quarterly loss for the first time since

1997, and had committed a $1.2 billion accounting error, among other problems facing the

company.  In addition, Lay knew that the balance sheet reflected approximately $7 billion in

embedded losses in business units and overvalued investments and that Enron had been

exploring such drastic solutions to Enron's financial problems as a merger with another company

and the sale of Enron's pipelines.

36.    Lay announced to the employees, "I have strongly encouraged our 16b

[management] officers to buy additional Enron stock.  Some, including myself, have done so

over the last couple of months and others will probably do so in the future. . . .  My personal

belief is that Enron stock is an incredible bargain at current prices."  Lay deliberately created the

impression with Enron employees that his confidence in Enron's stock was such that he had

increased his personal ownership of Enron stock in the past two months.  In fact, during the prior

"couple of months," Lay had publicly purchased approximately $4 million in Enron stock but

sold $24 million in Enron stock back to Enron in sales that were concealed from Enron

employees and the investing public.

37.    <u>October 12, 2001 Call with Credit Rating Agency</u>. On or about October 12, 2001,

Lay had a telephone call with a representative of a prominent credit rating agency.  Lay stated

15

that Enron and its auditors had "scrubbed" the company's books and that no additional write-downs would be forthcoming.  In fact, as Lay knew, Enron's international assets were being carried on Enron's books for billions of dollars in excess of their fair value.  Lay further knew that he made misrepresentations to  Enron's auditors in order to conceal the Wessex $700 million goodwill impairment, and falsely claimed that Enron would pursue a growth strategy in the water business.  In addition, Enron's auditors had not been able to "scrub" the books due to misrepresentations to them regarding Wessex goodwill.

38.    Third Quarter 2001 Analyst Call.  On October 16, 2001, Enron held its quarterly conference call with securities analysts to discuss its third quarter 2001 earnings results.  Lay participated in the call.  For the first time during the duration of the scheme to manipulate its reported financial results, Enron conceded that it had suffered large losses, totaling approximately $1 billion, in certain segments of its business.  These areas included many declining assets that had been concealed in the "Raptor" hedges, as well as EBS.  However, Lay attempted to mislead the investing public and omit information about these losses in order to minimize the negative effect on Enron's stock price.  Lay described the losses as "nonrecurring," that is, a one-time or unusual event.  However, as Lay knew, the losses were not properly characterized as non-recurring.

39.    In addition, Lay stated: "In connection with the early termination [of the Raptor structures], shareholders' equity will be reduced approximately $1.2 billion."  In fact, as Lay knew, the reduction in equity resulted not from the termination of the "Raptor" structures, but principally from a huge accounting error by Enron.  In a further effort to deflect attention from the equity reduction, Lay and others chose not to disclose the problem in Enron's third quarter

16

press release.

40.     Lay further stated that after review by its outside auditors, "we currently estimate, based upon this recent review, that up to $200 million goodwill adjustment may be necessary, and will be recorded as required by the accounting principles in the first quarter of 2002." In fact, as Lay knew, the adjustment did not account for the impact on Enron of the impaired Wessex goodwill of approximately $700 million, due to misrepresentations by Lay and others to Enron's auditors.

41.     Third Quarter Investor and Analyst Roadshows.  Immediately after the announcement of Enron's third quarter earnings results, Lay and other senior Enron executives held a series of meetings, or roadshows, with analysts and large institutional investors.  Lay and the other senior executives touted EES as one of Enron's three primary businesses, and misleadingly portrayed EES as rapidly increasing in profitability, quarter to quarter and year to year.  In fact, as Lay knew, Enron had shifted hundreds of millions of dollars in EES losses to Enron Wholesale in the first quarter of 2001, which gave EES the false appearance of profitability.

42.     October 23, 2001 Analyst Call.  Enron held a special conference call with securities analysts on October 23, 2001, in an effort to dispel growing public concerns about Enron's stock, which had lost 25% of its value in the week following the October 16, 2001, third quarter earnings announcement.  Lay and others prepared for and participated in the call.  Lay stated that "[w]e're not trying to conceal anything.  We're not hiding anything."  "We're really trying to make sure that the analysts and the shareholders and the debt holders really know what's going on here.  So, we are not trying to hold anything back."  In fact, while professing candor,

17

Lay failed to disclose numerous dire facts about the state of Enron's business of which he was aware.

43.    <u>October 23, 2001 All Employees Meeting</u>. Shortly after the October 23 analyst call, Lay attended another all-employee meeting, with live webcast and video teleconference communication to Enron's 28,000 employees. Lay stated "[o]ur liquidity is fine. As a matter of fact, it's better than fine, it's strong . . . ." In fact, Lay knew that in order to maintain liquidity, Enron had been forced to take the unusual step of offering its pipelines as collateral to obtain a needed $1 billion bank loan. Lay knew that Enron had failed to complete a $1 billion bond deal planned for execution since July, 2001. Lay also knew that the only readily available source of liquidity was the $3 billion corporate line of credit, which, if drawn, would signal the dire straits of Enron's finances. Indeed, three days later, Lay authorized the withdrawal of the entire $3 billion from the line of credit.

44.    <u>November 12, 2001 Analyst Call</u>. Enron executives held a special conference call with securities analysts on November 12, 2001, in another effort to dampen public concerns about the decline of Enron's stock and the nature of Enron's finances. Lay falsely stated that "[w]e don't have anything we're trying to hide. Quite the contrary, I think we've been very forthcoming of disclosing everything that we've found." In fact, as Lay knew, he continued to withhold from investors key facts about the true economic performance of Enron, including the true profits and performance of EES, the fact that the Raptors were not true economic hedges and that Enron faced billions of dollars in additional writedowns.

45.    During the conspiracy, the conspirators, including Lay received substantial criminal proceeds. During 2001 alone, Lay received a salary of over $1 million, a bonus of $7

million and $3.6 million in long term incentive payments. Additionally, during the period of August 21 through October 26, 2001, Lay sold approximately 918,104 shares of Enron stock to repay advances totaling $26,025,000 he had received from a line of credit extended to Lay by Enron. The total proceeds generated by Lay, and the assets to which certain of those proceeds are traceable are discussed below.

## II.    PROCEEDS OF THE CRIMINAL CONSPIRACY

46.    As a result of the criminal conspiracy described above, hundreds of millions of dollas in proceeds were generated; Lay alone generated approximately $95,113,717 in criminal proceeds from trading Enron stock, manipulating his Enron line of credit, and receiving an incentive bonus. In addition, Lay generated $3,956,649 in proceeds through The KLL & LPL Investment Partnership. The breakdown for Lay's specific proceeds is as follows:

```
    $11,588,717   Lay Personal Planned Stock Sales
  +   66,025,000   Manipulation of Line of Credit
  +    7,500,000   Unpaid Advances from Line of Credit
  +   10,000,000   Bonus
    ---------------
    $95,113,717   Subtotal Lay Personal Proceeds
  +    3,956,649   KLL & LPL Investment Partnership Planned Stock Sales
    ---------------
    $99,070,366   Total criminal proceeds
```

47.    The Personal Planned Sales of stock by Lay consist of pre-planned sales of Enron stock that took place during the course of the conspiracy. From April through August 2001, Lay sold 217,500 shares yielding gross proceeds of $11,588,717 in connection with this plan.

48.    The dates and amounts of the relevant pay downs on Lay's Enron line of credit during 2001 are as follows:

| Pay Down Date | Amount ($) |
|---|---|
| 04/27/01 | 4,000,000 |
| 05/14/01 | 4,000,000 |
| 05/25/01 | 4,000,000 |
| 06/12/01 | 4,000,000 |
| 06/19/01 | 4,000,000 |
| 06/22/01 | 4,000,000 |
| 06/26/01 | 4,000,000 |
| 06/27/01 | 4,000,000 |
| 06/28/01 | 4,000,000 |
| 07/26/01 | 4,000,000 |
| 08/20/01 | 4,000,000 |
| 08/23/01 | 4,000,000 |
| 08/24/01 | 4,000,000 |
| 08/30/01 | 4,000,000 |
| 09/04/01 | 4,000,000 |
| 10/23/01 | 1,500,000 |
| 10/24/01 | 1,700,000 |
| 10/25/01 | 550,000 |
| 10/26/01 | 2,275,000 |
| **Total** | 66,025,000 |

49.    The paydowns on the line of credit consisted of Lay selling shares of Enron stock back to the company and applying those proceeds to pay down his Enron line of credit. Lay then would turn around and draw additional funds on that line of credit. For example, on August 20, 2001, Lay sold 110,700 shares to Enron that then allowed him to pay down $4,000,000 on his Enron line of credit, and the next day Lay drew on the line of credit another $4,000,000.

20

Following this activity, Lay asserted in the September 26, 2001, on-line forum discussed in paragraph 36 above, that he had been purchasing stock "over the last couple of months," despite the fact that he surreptitiously sold six times as much stock as he purchased during that time frame.

50.     Lay generated $7,500,000 in criminal proceeds from his Enron line of credit that he never repaid. The unpaid advances were from October 2001 through November 2001. Lay's unpaid balance on his line of credit was due to be paid in full no later than December 31, 2005. This amount was never repaid.

51.     The proceeds of the conspiracy include a $10,000,000 bonus that Lay received in connection with his re-assumption of the CEO position at Enron during the criminal conspiracy is also subject to forfeiture as criminal proceeds. Lay re-assumed the CEO position and accepted this bonus money knowing that Enron's financial condition was being mis-represented to the public, and he continued to misrepresent matters to the public and his own employees following his return and during the period of the long-term incentive plan. As with his line of credit, Lay's bonus is wholly tainted by the criminal conspiracy in which he engaged at Enron.

52.     Lay also used a family investment partnership as a vehicle through which he generated criminal proceeds during the course of the conspiracy through its own sale of Enron stock. KLL & LPL Investments, Ltd. ("Investment Partnership") is a Lay family investment vehicle through which Lay was able to distribute his earnings at Enron to various family members.

53.     The Investment Partnership was established in 1994 and is held under the Texas Revised Limited Partnership Act, Tex. Rev. Civ. Stat. Ann. art 6132a-1, with its principal office

located in Houston, Texas. Lay and his wife, Linda Lay, were designated as joint managing partners of the Investment Partnership, which effectively gave Lay the power to manage and control the assets of the Investment Partnership.

54.    Because of Lay's insider status at Enron, the Investment Partnership that he controlled was eligible to and did engage in planned sales of 75,500 shares of Enron stock between April and August 2001 during the conspiracy. These sales, which represented approximately one half of the Investment Partnership's total planned sales, generated $3,956,649 in proceeds. These planned sales also constitute proceeds of the conspiracy to inflate and maintain Enron's stock price.

## III.    TRACING THE CRIMINAL PROCEEDS

### A.    The Condominium

55.    The vast majority of Lay's criminal proceeds were used in connection with his various lines of credit, the proceeds of which have been dissipated and cannot be traced into any particular assets. Lay's condominium, however, located at 2121 Kirby Drive, Unit 33, Houston, TX, represents property involved in money laundering. During the conspiracy, approximately $2,502,320 in proceeds were used as payments in satisfaction of a mortgage on Lay's condominium.

56.    On November 1, 2001, Lay received an advance of $1,000,000 from his Enron line of credit and deposited that amount in his Bank of America checking account No. 0026-6253-0707.

57.    On November 9, 2001, Lay deposited $525,000.00 into Southwest Bank of Texas account No. 5569133. The funds for this deposit came from Lay's Enron line of credit. Lay

deposited another $1,000,000.00 into this account from his Enron line of credit on November 27, 2001.

58.    On December 6, 2001, Lay withdrew funds from his Bank of America account No. 0026-6253-0707 in the amount of $977,320.00 payable to Bank of America. This money was used to help pay off a mortgage on Lay's 2121 Kirby Drive condominium. The entirety of this mortgage payment represents criminal proceeds because it originated from unpaid advances on Lay's Enron line of credit.

59.    On December 7, 2001, Lay withdrew funds from Southwest Bank of Texas Account No. 5569133, in the form of a cashier's check in the amount of $4.36 million payable to Bank of America. Lay used this cashier's check to pay off the remainder of his mortgage. Of that check, $1,525,000.00 represented criminal proceeds from unpaid advances from Lay's Enron line of credit.

**B.    Lay Investment Partnership**

60.    As a result of the criminal activities described above, the KLL & LPL Investment Partnership received $10,170,149 in criminal proceeds from trading Enron stock, transfers from Lay's manipulation of his Enron line of credit, and transfers from Lay's bonus. The breakdown of these proceeds is as follows:

|  | | |
|---|---|---|
| | $3,956,649 | KLL & LPL Investment Partnership Planned Stock Sales |
| + | 4,463,500 | Proceeds Transferred from Lay Line of Credit |
| + | 1,750,000 | Transfers from Lay Bonus |
| | -------------- | |
| | $10,170,149 | |

61.    Lay transferred criminal proceeds to the Investment Partnership from his Bank of

23

America checking account No. 0026-6253-0707. The checking account was funded by his Enron line of credit, as well as lines of credit at Bank of America. Between January 18, 2001, and June 29, 2001, transfers totaling $4,463,500 in criminal proceeds were made to the Investment Partnership as follows:

| Date | Amount ($) |
|---|---|
| 01/18/01 | 1,700,000 |
| 03/02/01 | 85,000 |
| 03/13/01 | 650,000 |
| 03/14/01 | 100,000 |
| 04/02/01 | 40,000 |
| 04/02/01 | 37,500 |
| 04/03/01 | 200,000 |
| 04/03/01 | 31,000 |
| 04/04/01 | 200,000 |
| 05/25/01 | 200,000 |
| 05/31/01 | 100,000 |
| 06/05/01 | 210,000 |
| 06/06/01 | 50,000 |
| 06/15/01 | 110,000 |
| 06/28/01 | 575,000 |
| 06/29/01 | 175,000 |
| **Total** | 4,463,500 |

62.    The Bank of America line of credit withdrawals that funded the payments to the Investment Partnership were paid back with criminal proceeds from the Enron line of credit between April and December 2001.

63.    An additional $1.75 million was transferred by Lay to the Investment Partnership on September 21, 2001. This amount was a portion of the $10 million bonus that Lay received in connection with his re-assuming the CEO position following the departure of Skilling, and thus represents criminal proceeds, as described in paragraph 52.

64.    The $3,956,649 in Investment Partnership planned sales are described above in paragraph 55.

65.    As of November 30, 2001, the Investment Partnership had approximately $30,563,623 of assets, $7,618,964 of liabilities and $22,944,659 of equity.

C.    **Bank Of America Checking Account No. 0026-6253-0707**

66.    As of December 31, 2001, Bank of America checking account No. 0026-6253-0707 contained approximately $22,680 in criminal proceeds that remained from the November 1, 2001, advance on Lay's Enron line of credit, as explained in paragraph 57.

## CONCLUSION

67.    Based upon the information contained in this affidavit, I have probable cause to believe that the defendant Investment Partnership property, real property, and funds located within the Bank of America account No. 0026-6253-0707 identified herein are derived from proceeds traceable to fraud in the sale of securities in violation of 15 U.S.C. §§ 78j(b) and 78ff, wire fraud in violation of 18 U.S.C. § 1343, and conspiracy to commit securities fraud under 18 U.S.C. § 371, and is therefore subject to forfeiture under 18 U.S.C. § 981(a)(1)(C). Further, I have probable cause to believe that the defendant real property represents property involved in money laundering, in violation of 18 U.S.C. § 1957, and therefore is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

Chad Nunez
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 23rd day of October, 2006

Notary Public
State of Texas
My commission expires: 7-13-2009

26